May it please the court. I want to make three points at the beginning of this. One is with respect to the injunction. The court lacked subject matter jurisdiction to enter the injunction because there was no article three case or controversy that supported it. There was no claim supporting an injunction. This is not a collateral matter subject to the court's inherent authority. Second, we believe the breach of the lease was conclusively proven and damages were conclusively proven. What was shown is that the PEP requirements under the lease were violated. My client exercised his remedies under the lease. Third, there was no defense shown under the lease. There was no breach of the lease. I believe what the only argument for breach was, was that my client, Mr. Chen, exercised the remedies available to him for violation of the PEP clause under the lease. And there was no retaliation defense under the lease. The Texas property code provides a retaliation defense but it is limited only to eviction actions and it does not conclude, it's not a defense to a claim for breach of a lease agreement. And there was no defense pleaded under the FHA Fair Housing Act and there is no such defense to a claim for breach of a lease. I would like to talk first about the injunction. Article 3, as we are all aware, contains an important limitation on judicial authority and that is... You're in control of your argument. Why don't you put the injunction last and move through the other things. I don't think the injunction is going to be a big hiccup. So go through the lease and the rest of it if you don't mind, and put the injunction last. Absolutely. The lease had a tax provision. It forbade the tenant from having any tax without the written agreement of the landlord. A pet was brought in without the written agreement of the landlord. The breach was initially admitted by Ms. Adams. She said that the My client, Mr. Chen, had options under the lease. And the options, the remedies under the lease, one of those, was to request pet rent. He did that. They chose not to pay it. They instead provided an email from a nurse practitioner. They were in breach of the lease at that point and Mr. Chen exercises remedies of default. They chose not to pay the pet rent and so he chose to exercise the default remedies under the lease. And he did that. Mr. Higgins, let's assume arguendo, I know you contested, but let's assume arguendo that Waffles was a comfort animal and that comfort animals are in fact under the FHA, you must allow them. Let's just assume that arguendo. In that situation, why is this not a defense to the breach of lease, if that's true? Well, the statute does not provide that that is a defense to a breach of lease claim. Neither the federal statute nor the state statute provides that that is a defense, number two, there is only a duty to accommodate if the if the handicap under the FHA and the necessity and need for the accommodation is made known to the landlord. And it was not in this case. That was not done. And there was a request made by... Is that because she just brought the pet in without saying anything? Is that what she did wrong? If she had instead said, dear Mr. Chen, I'm getting a comfort animal due to my mental health issues, that would have then been okay under the FHA? Again, assuming arguendo, it covers this and that she does need one. Well, she would have had to have provided something from a qualified physician, a letter from a qualified physician outlining what the condition was and outlining why there was a need for accommodation. She did not do that. She did not do that. That was never done in this case. The only evidence that Adams and Chen cited to in their email traffic preceding, or the text message traffic that preceded that email, that this was a request to thwart an addiction. The only other evidence they cited was an interrogatory answer. And the interrogatory answer, of course, was after the fact. It was after the fact. So even if we make that assumption, it is not a defense to the police. There was no FHA claim before the court at the time of trial. That question was no longer before the court. All that was left before the court was breach of the lease and a state law, a state statutory retaliation claim. And the statutory retaliation claim does not apply to actions from breach of the lease. The statutory retaliation claim does not excuse a tenant from paying rent and amounts due under the lease. What the state statutory retaliation claim does is it allows, expressly allows the tenant to assert a set off for amounts withheld, lawfully withheld under the lease. That's not applicable. Even if we get to applicability of the defense in this case, they did not show it. And the reason they did not show it is they did not show a good faith basis for that defense. Good faith, and it's laid out in the brief, has been defined as having two components. One is a subjective component. The other is objective. Under the subjective prong, there is ample evidence that this was not good faith. Ms. Adams initially contacted the landlord and she indicated that she was only contacted by the landlord about the dog. And she responded, well, it was a birthday gift and we'll make it right. That's all she gave. Only after my client, Mr. Chen, requested payment of a pet rent to which he was entitled under the lease did Ms. Adams raise for the very first time the supposed disability. And the evidence in the record shows that that was not in good faith. She texted her friend who was a nurse practitioner, told her she had a problem because she might get evicted, and told her that she needed some kind of letter. The nurse practitioner responded, I'll get you the letter. I've got to research what I need to say of this. And so only after that was the letter provided. So there was no subjective good faith, and I forget that there was no objective good faith either. The Texas good faith test requires an inquiry into the knowledge and background and experience of the individual exercising, purporting to exercise the right. And in the record, Ms. Adams' own testimony was that she was a real estate agent. She was trained as a real estate agent. She did not make a, she did not invoke or establish a, or tell her client about a handicap, an FHA handicap. And her client proceeded. Now, a third point that I believe has been raised by Adams and Chen is this whole idea of the interactive process. The interactive process is not in and of itself the basis for a claim under the FHA. And there was no claim under the FHA. But it's not a basis for a claim or defense. What it is, is a basis of, it may become an issue relating to intent only if an FHA handicap is established. And I would like to turn with the time I have left to the injunction. The injunction, there was no claim of controversy before the court that supported that injunction. There was no request for an injunction. How come you all didn't object to the district court to the injunction? Why did you wait to tell us about it? Well, trial counsel did not object to it. But I would submit that no objection was required. And the reason is that this is a matter of the trial court's subject matter jurisdiction. And there was no case of controversy for two reasons. The first was there was no claim. There was no claim giving rise to the need for an injunction. The second was, is that there was no claim of likely, prospective, ongoing harm. Both of those are required. And I believe the most illustrative prediction on that in the Fifth Circuit is Stewart versus, the court's decision is Stewart versus Wells Fargo. And the facts of that case are laid out in the brief. But I want to speak to something else. Because I think in Adam and Jim's brief, there was kind of a no harm, no foul argument about the injunction. After all, there's no chance that these people will run across each other again. I want to speak to that. Because this injunction was very broad. It reached not only Adams and Piper, but anybody correlated with them. And it reaches the Texas Department of Protective Services, and anybody correlated with that. Now, I don't understand the term correlated in this context, but I understand it in statistics. But I don't understand it. But set that aside, I believe this reaches, suppose that Mr. Piper's father or mother has a lawsuit against Mr. Chen's client. I believe that reaches Mr. Chen's representation of his client in that lawsuit. This is a very draconian injunction, and there is no case for controversy before the court. And Adams and Chen, my clients, have asked the court to reverse judgment in their favor. And unless the court has further questions, I will yield the remainder of my time. All right. Thank you, Ms. Higgins. You've preserved your rebuttal time. All right. We'll hear now from Ms. Monito. May it please the court. My name is Audrey Monito. I represent appellees Brooke Adams and Wilson Piper. And in my time before the court, I will address why the district court's judgment and injunction were proper. And I will do this in two parts. First, the district court's judgment was proper because high deference must be given to the district court judge, the sole fact finder, who determines after weighing all the evidence and testimony at trial that appellants did not meet their burden of proof and that judgment should be rendered for Adams and Piper. And second, the injunction was within the district court's inherent supervisory powers, addressed the collateral issue to the case, and was absolutely necessary to curb appellants' malicious conduct toward Adams and Piper. With regard to my first point... Let me ask you this, Monito. If Mr. Chen observed some completely unrelated person abusing a child, would he have to go get the consent of Judge Hughes before he could call Child Protection Services in order to be in compliance with his injunction? No, Your Honor. The injunction only curbs behavior from appellants directly toward Adams and Piper given their false DPS complaint in the myriad of what the district court called imaginary lurid claims and false complaints made against Adams and Piper by appellants. So it does not affect Mr. Chen or his wife's ability to report to DPS any abuses that they observed from an unrelated party. With regard to the judgment, it's well established that the standard of review for a bench trial is clear error for findings of fact and de novo for legal issues. According to the U.S. Supreme Court in 1985 case of Anderson v. City of Bessemer, this standard is highly deferential to the district court and does not entitle a reviewing court to reverse the district court's findings simply because the reviewing court would have decided the case differently. If the district court's account of the evidence is plausible in light of the entire record, the appellate court may not reverse it. In the Fifth Circuit, it said in 2012 that the district court's findings would only be clearly erroneous if one of these three applied. First, the findings are without substantial evidence to support them. Second, the district court misinterpreted the effect of the evidence. And third, this court is convinced that the findings are against the preponderance of the evidence and the credible testimony. And as I will explain, none of these are applicable to this case, and the district court's judgment should stand. Ms. Meneca, I just pulled up the injunction, and it says Chen and Soto are prohibited from contacting trauma-protected services. Period. It doesn't say now, Adams and Pfeiffer. It says protected services. That could cause Mr. Chen to be in a position of either violating injunction or violating law, which requires, in some situations, reporting wrongdoing. Respectfully, Your Honor, what I would say is that what the injunction says is child protective services and any other person or entity conceivably correlated to them, which means they're not going to be able to go out and make another CPS complaint against Adams and Pfeiffer. They've already made one false complaint. It doesn't say about. It says and. So that's anybody correlated to any of this pile of people. I mean, it's extremely—you would agree that Mr. Chen should not be prohibited from contacting child protective services if he's at the grocery store and he sees some child being abused or calling 911 and then reporting it to child— I mean, that's a hugely broad statement and very concerning to me because, of course, we want people to contact child protective services when somebody is being—when a child is being abused or appears to be being abused. Absolutely, Your Honor. And it would be vague but for the first—very first paragraph of the permanent injunction, which specifically addresses the variety of complaints made by Sam Chen and Tao against Adams, Pfeiffer, two child protective services. These complaints were corruptly made with no minuscule amount of truth to any of them. And so without that first paragraph, it might be a little overbroad, but because in the context of this paragraph and especially in the context of all the evidence that's filed and the fact that the judge did—I'm sorry, the appellate did admit to making the CPS complaint and the only evidence they had at trial was none whatsoever with regard to the basis for their CPS complaint. And you didn't ask for the injunction? I mean, if it's so egregious as you're arguing now, you—I don't know if you tried the case, but, I mean, it didn't appear to be so far-reaching to ask for an injunction as part of the relief ask. The district court did this sua sponte, you know, and for all your arguments about deference on the record, it's still a sua sponte injunction, broad. You didn't ask for it. So on appeal, you're saying, oh, yeah, we really needed it. You know, it's the best thing going and so forth. You know, counsel opposite makes a forceful argument that it's a broad injunction, wasn't asked for, it's jurisdictional. So regarding this of your argument about, you know, the record, what about the jurisdictional piece? Your Honor, the appellants, when the CPS complaint was filed, it was made anonymously. We did not know until trial that appellants were the ones who filed the CPS complaint. They admitted it at trial. And further, we actually sought sanctions against appellants, but the district court declined to do so and instead issued the permanent injunction, sua sponte. We did not request it, but we did seek something higher than that, which were sanctions. And, you know, pivoting to the injunction, with regard to sanctions, that's a collateral issue that a court may consider with regard to processing a litigation to adjust an equitable conclusion. Collateral issues include whether an attorney has abused the judicial process. And what Adams and Piper are arguing in this case is that sanctions would have been appropriate because Mr. Chen weaponized his law firm against them. And the district court declined to issue the sanctions, but in order to curb their bad behavior, issued the permanent injunction. It was a collateral issue because the district court stated that it was their behavior that he was trying to curb with this permanent injunction. And in fact, with regard to this injunction, he went into a detailed process listing all of the myriad of complaints that they had made against Adams and Piper that were corruptly made. With regard to the issue of this judgment, you know, the appellants have the burden of proof here. Adams and Piper did not abandon all of their defenses. They only abandoned their claims. And so they still had their affirmative defenses, their general defenses, all of those were there. The burden of proof was not on Adams and Piper in order to prove their defenses. It was on appellants to prove the breach of the lease and they could not do that. They couldn't prove it that it was a breach through the dog because the dog was not a pet. It was an emotional support animal, which is what makes the Fair Housing Act relevant to this case. They couldn't prove it with regard to their alleged allegations of the property being used in a commercial manner. They couldn't prove it with regard to HVAC rescheduling, turning off utilities after Adams and Piper moved out, or vacating after they were issued notices to vacate. None of the five areas in which they alleged breaches, they were able to prove it. What part of the lease was complied with with respect to the second pet? Your Honor, it wasn't a second pet. It was a second dog. And it was a dog that was an emotional support animal.  Yes, Your Honor. With regard to the second dog, it was outside of the lease agreement because the pet provisions of the lease agreement are not applicable to an emotional support animal under the Fair Housing Act. Well, the lease says if you bring a dog in or a pet, you get consent of the landlord. I mean, that's what it says. They did that with respect to the first one, so that wasn't hard to understand. So, with respect to the second one, notwithstanding this argument it was needed for emotional benefit, why didn't the lease apply to then get consent? I mean, the lease says that. You're drawing this line between, well, it's not a pet, it's something else, but you're arguing that that provision of the lease is inapplicable? Yes, I am, Your Honor. And that's exactly right. The lease says pet. It doesn't say dog. It doesn't say animal. It says if you bring home a second pet. And our argument, as you aptly pointed out, is that the second dog was not a pet. It was an emotional support animal which was registered as an emotional support animal before it was even brought into the unit. And so, the registration certificate on file in the evidence has a date of registration of December the 4th, 2017. Ms. Adams testified on the stand that she registered the dog before she ever took it home. So, the breaches alleged by appellants were not proven enough by them. I'm sorry, Ms. Mendejo, she didn't tell Mr. Chen that. She waited until he discovered the dog before saying anything to him about it. And her first statement was that the dog was a gift. Yes, Your Honor. And saying the dog is a gift does not prohibit her from then saying that it's an emotional support animal. The two are not mutually exclusive. It can be both a birthday gift and an emotional support animal. Oh, come on, Ms. Mendejo. You're playing word games with us. Now, this is a lease that was sued on. You're drawing this line between pet and dog and she didn't say it first. I mean, she had a straight line lease. She had paid the deposit for the first one. She had all this proof that you say she had. There's nothing in the record that I saw that this was presented to the landlord and so forth. So, now, you know, you're bobbing and weaving here. So, help me understand. Why isn't the landlord able to say it's a straight line breach if she had that proof and went to him and told him about it? Now, you seem to be changing an argument than what was presented below. Your Honor, the Fair Housing Act, in all of the cases that are cited in the brief, in Adam's and Piper's brief, in none of those instances were the landlord informed about the dog, the emotional support animal, before they were brought home. And, in fact, in the case with regard to, in the, sorry, one second. In the case of Taylor, association of apartment owners of Louisville Kalani Gardens versus Taylor and the Fair Housing of North Dakota versus Goldmark case, as well as in some of the other cases that have come out after the printable case cited by appellants in their brief, it is said that an exception to the no pet rule is required under, may be required under the Fair Housing Act. And in none of these cases was the landlord informed prior to the emotional support animal being brought home. And in the Booth versus Hunter case, the District Court of Oregon held that the landlord violated the Fair Housing Act by failing to provide an exception to the no pet policy for an individual suffering from anxiety and depression, much like Miss Adams here. There's no duty under the Fair Housing Act to inform the landlord before you bring home the emotional support animal that it is an emotional support animal. Reasonable accommodations must be requested, but the Fair Housing Act is vague with regard to when that accommodation needs to be made. And, in fact, the Fair Housing Act does not say that that accommodation has to be made ahead of time. It just says that it has to be requested, and Miss Adams did request it. So with regard to the injunction, I'm sorry, with regard to the judgment, it is proper. There's substantial evidence in the record. The testimony of the trial, the trial testimonies of the verdicts weighed heavily in regard to the evidence at trial. And due regard must be given to the trial court's opportunity to judge the witness's credibility. The trial testimonies here were from Nurse Adams, Nurse Jenke, appellants, and Miss Adams. The district court found that appellants were not credible based on their actions inside and outside the courtroom. Their testimony was not credible. Far from credible, the district court found that the appellants were malevolent and vindictive, and their claims for breach were merely a ruse for their vendetta. They had imaginary, lurid claims. These were statements made in the court's findings of fact, that the appellants' claims were imaginary and lurid. Meanwhile, the district court found that Adams and the nurses' testimonies were credible, and so appellants were not able to prove breach of belief. It was their burden to prove. They were unable to meet it. The district court is the fact finder, the first fact finder in this case, and deference must be given to the district court's findings. As such, because the findings are not against the preponderance of credible testimony, there's nothing in the record to indicate that the district court misinterpreted the evidence. If we accept the fact findings of the district court, we don't have to accept the legal conclusion. So we're still back to this overarching question of whether, in fact, this is a defense to a lease. And that's the legal question. So while we respect the district court, we don't have to give any deference to the district court's legal conclusion. Only the series of events, which, frankly, that timeline about just bringing the dog in, then getting the call from Chen, then saying that it was an animal, that's not really disputed. So that timeline that the court found, the question is, is that a defense? Because no doubt the dog being brought in, I mean, it says pet, but then it says it's recipes, including but not limited to any mammals, blah, blah, blah, blah, blah. So it doesn't limit it to an animal that you are bringing in only for fun. And so I don't agree that the term pet is somehow positive here. Yes, Your Honor. With regard to the defenses, again, the burden of proof was not on Adams and Piper. The burden to prove breach was on appellants. They were the ones who had to prove it. The burden to prove that the legal question of whether the FHA violation, if any, is a defense, that's a legal question. The burden to prove a defense is on the defendant. So the question is, unless we accept your argument, and maybe someone will, that the term pet, including but not limited to all mammals, reptiles, insects, etc., etc., encompasses a support animal, unless we accept your argument that it doesn't, then that is, I mean, she obviously brought in an animal and had not paid the extra fees and gotten the permission and all of that. There's no question about that. So we are to your defense or your client's defense, right? Well, Your Honor, my client didn't allege the Fair Housing Act as an affirmative defense. They had general defenses, specific denials, and so they had defenses beyond the Fair Housing Act. And one of the findings that the district court made was that although Adams was not required to make a pet deposit, she offered to make one. And the landlord declined to take it and posted a one-day notice to vacate the very next day. This was less than three months left on the lease. This was in December, right before Christmas, and they had a one-year-old at home. We have $45,000 in attorney fees for appellants because of this multiplication of litigation because the landlord just so happened to be an attorney with his own law firm. And so that kind of leads me kind of back to the injunction, is that it's meant to curb the behavior by appellants. They weaponized their lawsuit against Adams and Piper, against their tenant. He's a lawyer. He had his associate file two eviction lawsuits, one which was filed after they had vacated the premises. And so the district court properly weighed all of their claims and called them imaginary, lurid claims that stemmed from something other than a breach of the lease. That stemmed from something other than Adams bringing home a second dog. It stemmed from some mysterious vendetta that they had against Adams and Piper, which led to a false CPS complaint, which led to... But the defendants withdrew all of their claims. They just maintained their defenses. So to the extent that you can sue someone for falsely reporting to the CPS, and I'm not saying you can, but to the extent that you can, they did not pursue that claim. That's right, Your Honor, because they don't have their own law firm. They didn't want to continue on with the litigation. And they had attempted a couple of different times in order to see if there could be a walkaway between the parties, and it just was never something that a landlord who owned a law firm would entertain. And so, Your Honor, it's for these reasons that the district court's judgment should be affirmed, as well as the district court's injunction. The injunction was within... Let me ask you this. If we conclude that the injunction is overbroad or improper, should we send it back for reconsideration of the sanctions? Because that seems to me a little bit of a separate issue, the issue of sanctions, from the issue of whether you can just sue a sponte issue this broad of an injunction. I would not disagree with that, Your Honor, because we did seek sanctions. But you didn't cross-repeal the lack of sanctions? No, Your Honor. And, respectfully, my time is up. All right. Thank you, Ms. McGill. We're back to you, Mr. Higgins. Yeah, yeah, yeah. I'm sorry. If I have her answer that, though? No, no, no. Go ahead. I'm sorry. She was backing away from the matter, as opposed to that, saying her time was up. No, go ahead and ask her. I'm sorry. I just want to know, is it your position that we can or cannot send it back for sanctions since you did cross-repeal? That's my question. It's up to the discretion of the appellate court if you'd like to send it back for sanctions. We did not cross-repeal the denial of sanctions, but it would really be up to the decision of the appellate court. Okay. Thank you. I'm sorry, Judge Stewart. I didn't know. No, no, no. Good point. That's the value of the argument, to be able to ask the lawyers while we have them. All right. Thank you, Ms. Menil. We're going to shift back to Mr. Higgins for rebuttal. He's unmuted. I keep trying not to. Wait, you're muted, Mr. Higgins. Hang on just a second. He should be okay now. Are you Mr. Higgins? I'm still seeing the microphone with the line through it on Mr. Higgins. That's not your fault, Mr. Higgins. It's something that the court has. Somebody else is fooling with it. Well, I don't think it's you, but it could be Mr. Higgins. But I still see the microphone with the line through it. I am unmuting it, and it won't unmute. So I'm not sure if it's something on his end.  Mr. Higgins? Okay, go ahead. Mr. Higgins? My square says Houston Brazos. Yeah. Who are you? Daniel, can you jump on? I can't figure out why he's muted. Are you Mr. Higgins or are you Mr. Brazos? Higgins. I think that's the name of his office, probably. Okay. That's why it's showing up like that. Daniel, are you there? He's not responding. Okay, Mr. Houston Brazos is not unmuting for some reason. Okay, it's gone now. What you did just a second ago unmuted it. Try that again. Okay, now speak again. Okay, I apologize. I don't know why that would have happened. If it happens again, I will go get our IT guy to help. All right, you're good to go. You're on for rebuttal. Thank you. The outset, I would like to point out that the injunction was not a substitute for sanctions. Not that it matters, but the sanctions were considered after the injunction. So any argument that the injunction is somehow equivalent to sanctions is incorrect. Also, if one looks at the injunction and the findings in the injunction, there are no findings that would support a sanctions order. This case concluded in the district court and there has been no cross appeal on the sanctions. We would submit that the court has no discretion to send that back. I want to talk about the findings. The findings did not support the trial court's conclusions. The findings focused heavily on conduct by Ms. Papp. Conduct by Ms. Papp, not conduct by Mr. Chen. Conduct that was not before the court. Was the conduct actionable? I don't know. But the conduct was not sued upon. There was no claim before the court. So what we are left with is a claim for breach of lease. The breach was proved. And I believe what Adams and Chen are arguing for is a new rule of law whereby a lease is suspended, any permission, by a claim that someone requires an accommodation. And that is a breathtaking proposition. And Congress did not enact such a proposition. I think in a lot of aspects of this case, this comes back to the ultimate, or the basic fundamental restraint on courts, which is that courts adjudicate the complaints that are before them, that are brought to them. Courts don't roam the record in search of perceived wrongs to be righted. And we believe that is what happened in this case. That is what happened with the injunction. And that really is what happened with the findings and the judgment. There was no breach. There is no finding of any provision that my clients breached. The court says that my clients breached the lease. But there's no provision stated. There's no provision cited. And one can scour the record and scour the lease and find no breach. The only act that they're complaining of is that Mr. Chen exercised his remedies under the lease. And that was the parties' agreement. That's not a breach of the lease. So we would ask the court to reverse and interjudge it on behalf of my clients. And unless the court has additional questions, I will yield the balance of my time. What's your take on counsel opposite, you know, pet versus dog versus all of that, vis-a-vis the lease itself? Well, I don't believe that as a substance for support. The wording of the lease is very broad. What they argue, or what the argument would be if there was an FHA claim, is that an accommodation to the no pet policy was required. And I don't think there is a single case holding that obtaining a certificate, a certificate that you've been sent away for, and with no showing, converts a dog from something other than a pet. There is no, any principle of contract construction in Texas would allow a court to rewrite the parties' agreement in that matter. And I would also point out that the certificate for the type that Ms. Adams offered in harm with the Shoreline Towers Phase 1 condo, 347F Federal Appendix 464, that's the 11th Circuit, 2009, that was a very similar situation. The plaintiff contacted the homeowners association and said it was a pet, and then when that was denied, provided the certificate. There's no support for that claim. Thank you. Mr. Higgins, did you remove this case to the federal court? My clients did, because my clients, because Ms. Adams... Did the district court have jurisdiction for you to remove it? Yes, they did. It was removed based on the FHA counterclaim that was asserted by Ms. Piper,  and the court retained jurisdiction under its supplemental jurisdiction, which the court chose to retain. The court could have sent the case back to the state court. After the plaintiffs chose to dismiss that claim, they did not. The court did not. I'm not sure I followed that. Oh, well... Whether it was a diversity jurisdiction or federal jurisdiction. I apologize. There was a claim pleaded for violation of the Fair Housing Act by Adams and Piper. That's the basis of your supposed jurisdiction and removal jurisdiction? Right, the federal question jurisdiction. Okay. Removed based on a federal question. After the removal, following the removal, Ms. Adams and Mr. Piper dismissed that claim. At that point, the court had supplemental or ancillary jurisdiction over my client's reach and lease claim, and the court exercised its discretion to retain that jurisdiction. My client's, incidentally... It wasn't the counterclaim that gave jurisdiction. It was the claim. I mean, they were the original plaintiffs, the Adams group, were the original plaintiffs, and that's why you could remove. That's correct. If you were the original plaintiff, you could do that, right? That's correct. It was the claim, and even if it was a counterclaim, it would have... By them, it would have created a federal question. And once the federal question was gone, the court retained the ancillary jurisdiction. The FHA claim is what triggered the court's jurisdiction. Thank you, sir. We'll look into that. All right. Did you have additional questions on the jurisdictional matter, Judge Dennis? Go ahead. We got time. No, I think I've been asking what the basis of jurisdiction is since I first saw this case, and nobody's really explained it too well to me. I hope I explained it, Your Honor, but I can try again. Give it one more shot. Okay. Adams and Piper amended their petition to state the claim under the Federal Fair Housing Act. That was a federal question that created federal jurisdiction, and my clients removed the case to federal court. Once the case was in federal court, Adams and Piper dismissed all their claims, including the Fair Housing Act claim. At that point, the court had, I believe, supplemental or ancillary jurisdiction over my client's claim for breach of the lease. And the court chose to exercise its discretion to retain that jurisdiction. It did? There's an order to that effect? It's stated on the record. I don't know if there's an order to that effect. I don't know the answer to that question, if there is a written order. But it was stated on the record. My clients had asked for a remand once the Fair Housing Act claim was gone, and the court denied that request. It was a verbal request. Okay. And I believe... Thank you. I hope I explained it. Thank you. All right. Additional questions, Judge Dennis? No, I think we just have to look at the record. All right. Any other questions, Judge Haynes? No, thank you, though. Appreciate the argument. All right. Thank you, counsel, for both sides. Appreciate the arguments. Appreciate your participation in this setting. Your argument is very helpful. The case will be submitted, and we'll decide it in a written opinion. Thank you. So that concludes our cases for the argument for today.